Okay, Mr. Wallace, whenever you're ready, but no rush. May it please the Court, I'm Mike Wallace, Counsel for Emmerich Newspapers. The men and women who adopted the Copyright Act in 1976 never heard of the Internet, nor did they have any idea of how it would operate. They did know that communications technology had been changing ever since Gutenberg built his printing press, so they designed their statute to apply to existing technologies and to future technologies that they could not imagine. To do so, they used English words of commonly accepted meanings, which did not require an engineering degree to understand. The words that Congress chose in 1976 compel reversal here. The first issue in this case involves the word display, which the statute equates with show, and the dictionary defines show as to pause or permit to be seen, which is exactly what happens every time the browser provided by Pinnacle to its customers shows Emmerich's copyrighted content when Particle's customers click a snippet on the news feed provided all day every day by Particle. The second issue in this case arises from the Digital Millennium Copyright Act of 1998, by which time Congress knew a little bit more about the Internet, but they saw no need to change the words they had adopted in 1976. They found them to be sufficient for the purposes then, but they did know the Internet was threatening copyright holders, so they added new language, new protection, and the word they used there was information, copyright management information, which Section 1202C broadly defines to include many different things about a copyrighted work. Okay, so just let's go one at a time, because I agree the important thing to do here is look at the statute and not the technology, and there are simple terms, and you've described them exactly, display is cause to show, but then 101 definitions do take us a couple layers different, and the way I read it, or at least their view, is that when you get a little deeper, 101 limits it both as to what's happening and what's being shown, and so the verb that's critical is transmit, and so the difficulty is just connecting isn't itself transmitting. Your client's the one that has to transmit it, and then the what problem is, as I understand it, it's got to be a fixed copy, but you control whether it's fixed. These embedded links actually are alive and dynamic. You can block them. Your Honor, save me a couple of pages of argument, because I agree with you. That's where we are. That transmit is the key question in this case, but once again, transmit is defined to mean communicate, and communicate is a pretty broad definition. Again, the... But would it be relevant to that, they can't display transmit anything if you stop them. If you put up a paywall, if you block, if you have watermarks, so it sounds like the necessary for there to ever be a shown something is your client has to transmit. To the best of my knowledge, there is no evidence in this record about the ability to block anything except for Mr. Emmerich's affidavit, which says there is no practical way for him to block particle away from his articles. So the idea that we're just innocent bystanders, and our customers are dealing directly with you, and if you wanted to stop, you could stop. Nothing in the record supports that argument. It's not there. Now, that doesn't excuse us from talking about what transmit means, but the idea that my client could have stopped it is no better a defense in law than if a burglar says you should have bought a better lock. But the Seventh Circuit's analogy, which looks to me like the server test, but you challenge that, they sort of made it into simple terms. It's like the New Yorker. It lists where the theater is and the name of the play playing at the theater. It's just connecting you, the reader. It is a, the Seventh Circuit case is a performance test, not a play test. Right, but you know the analogy. Judge Posner is very good at saying what he wants to say, but this is not the New Yorker just telling me how to find a show. This is the editor of New Yorker picking me up in his limousine, driving me into the alley, opening the side door, and sending me in without buying a ticket. That is Particle's business plan. They sign up customers, they give them an app, they give them a search engine, and they send them day after day things that they might want to look up, and they advertise on everything that shows up on the screen and cost Mr. Emmerich money and business. Now so, the analogy Judge Posner gave does not apply to this case. It's not just a question of telling them an address. They don't tell them anything. They send them these snippets. You click on the snippet and they never, they don't call the customer and say, do you really want to see this? They push a button, a bunch of electrons wind up, and because of what they did, they go directly to my guy's site and the customer gets to see it. But if you're right on the statutory language, then there's sort of, do you have limiting principles for two different sides of the equation? One is the user, because the user is causing it to be shown just as much as the platform when they click. One question, related question is, why wouldn't your argument statutorily then apply to search engines like Google sending us photos? I would said, I think it's, as I thought about this, is it's Getty fine. They're going to transmit it back, but they're going to attach their watermark, and that's what protects people like your client. I think that, I think that their scholarly amici helped very much with the answer to this question, particularly when they sent us to the new tentative restatement. Because what they say is, and they think it helps them, and I think it doesn't. Any result in any aspect of the law has a ton of but-for causes. There are lots of but-for causes. And whoever are the engineers that run the whole internet are a but-for cause of everything. You don't want to go back that far. But they say you have to look at the particular but-for cause that is the driving force here. And the driving force here is particle. And the way you tell- That's the limiting principle. And this court has adopted it when they used the volitional test. Is it BVP? I'm not sure I got all the letters correct. BWP. But I was going to ask you about that because Jerry Smith says we can't have countless liability. Every time there's an ephemeral showing of a photo, there's not countless liability. Isn't that sort of edging towards the server test? It may edge you toward the server test if the server test was supported in statute, which it clearly isn't. But again, I think the best way to look at it is the way this court looked at it in DWP. There's a chain of causation. And to determine whether somebody is liable, then the volitional test look, did you do something that is what the statute was trying to regulate? And in this case, their whole business plan is set. I know. And I'm going to ask as many difficult questions as I can comprehend of them. But I am appreciating this. Is there any circuit that has ever adopted this moving driving force theory, rejecting perfect ten? As far as I can tell, no, there isn't. So you want us to do it? You're that confident? I'm confident that this court tries to follow the language that Congress chose. Possess is not there. I don't know what your test is going to come up with, but it's not going to be the server test because you can't. There's no requirement of possessing. So I think transmission, it's communicate, it's like everything else in this statute, broadly shown. You don't have to read the Senate report to know that because it says by any device or process. And what they originally did was downloading our articles. That's clearly a violation. And the next thing they did was try to skin the cat another way. And they came up with this elaborate device or process whereby they send snippets to their customers. The customer punches a button, and then through the process of communication, they communicate to the customer. They cause the customer to communicate with us. And that displays our article. I think that's a device or process within the broad language chosen by Congress. How convoluted can you get and still be a device or process? I think the volitional test is the best thing you have to work with. I want to spend a minute. One thing, Mr. Wallace. Judge Higginson said no circuit has agreed with you, but have some district courts out there agreed with you that the server test is not consistent with the statutory language? And if you could point us to which one of those you think most closely aligns with your argument. I think the initial case in the Southern District of New York was Goldman. And a lot of people have followed Goldman, including district courts in this district. But as I say, much as any district court in the United States is entitled to respect for its opinions, Congress is entitled to greater respect. And you just need to look at that statute and figure it out as best you can. The second thing you have to figure out about the statute is what does copyright management information mean? And this half of the case deals only with the infringing downloads. We're not talking about framing and the three-quarter bank shot of causation. We're talking about these articles that were downloaded and copied completely onto their website. And Judge Lee has already found the infringing. Now, the way you get to see those downloaded articles, and I understand they've eventually been taken down, is through the snippets. What their crawler does, as I understand it, is to take the entirety of Emmerich's article and strip away everything but a couple of sentences. And that's turned into the snippet. One thing that they strip out of the article is its URL. And they import their own URL. So when you click the snippet, it goes to their website and not to Emmerich's website. And that's how Emmerich's damaged. So they've removed what you say is protected information. Yes, and not only protected information. But what they say is they've just removed the locator. On the way over here, and it is a locator. But it's not just a locator. It contains the name of the article. And Judge Lee did not give any reason why something can't be a locator and a name of an article at the same time. On the way over here this morning, I walked past 400 Poydras Tower. It's an address, and it's a building. And a URL is not only an address. In Emmerich's case, it contains the title of the article. Well, then what about the, again, a limiting principle? And you may just say it's what the statute commands. But what about the library amici that says if you're going to shorten a URL, like permacc, you're violating CMI? It takes you to the same place, though. And what he did. Is that relevant, though? I'm just interrupting because of your time short. We aren't really worried where it takes us. The argument, as I understand it, in the second issue, unless I'm wrong, is is there information that is being altered or removed? Forget where it goes. I'm wondering, that's what we seem to do when we have these permacc things. And again, that is getting beyond my engineering capacity. I know what the copyright that Emmerich wants to protect is to get you to his article. Now, somebody else may complain about an abbreviation. But if you can get to Ms. Emmerich's website faster, he's happy about that. We don't have a lawsuit. He may be happy, but your lawsuit is that was information that is protected. And my question is, well, and then there's a separate question of it's also a link. Or is it not a link, right? You probably want to get to that. What I don't want to get to, and I'm down to my last minute, is to say, that's why you put us forth. I was worried about that. That's what I had to do? I was afraid we were going forth because you had more questions. Oh, you were looking forward to a finish. I was hoping to get out of here and sit down. No, no, you're doing great. I mean, it's a really difficult case. So take your time and answer. You're on the URL point. Here is where I think the limiting principle that Congress designed is. It is in the rest of the statute, which says you can't destroy all of this stuff, but you're not liable unless you have a certain level of scientere. And I think the opening door is going to be very wide. If you destroy copyright management information, potentially a lot of stuff comes in. OK, I see. And that seems to lurk behind the exact same panel, energy intelligence, right? If your intent was to deceive, you're in trouble. I think that's the limiting potential on the CMI side. They were trying to get us to their website instead of this Emmerich's. That's a violation of CMI, or the means by which they did it is a violation of CMI. But the defense against over-liability is found elsewhere in the language Congress adopted. And that's, did you have this scientere of infringing on copyrights? We'll have to prove that when we get back to the district court. I think we can. But that doesn't have to be your concern today, except to say that statutory requirement is the limiting principle that is going to solve what you're worried about. Thank you, counsel. Thank you. Carmody. May it please the court. My name is Steve Carmody. I'm together with Karen Howell, who represent Particle Media. We heard a lot about the process and about the Newsbreak app. I would ask your honors if you have any questions about how the app works and how it worked in this case. And I invite your questions in that. Because otherwise, I'm going to go right into the server test and the CMI, which are the two. Well, I guess my overarching question is the statute's trying to give creators an exclusive right to display their product. And I think it's correct. It's hard to understand how there isn't an infringement if everything on your site is somebody else's work product. So what we do is the same thing that what Google does with Chrome and Apple does with Safari. We send people to websites to get information. And it's pulled back in. And it's displayed in the web view. I mean, I appreciate that. That is what happens. This isn't necessarily a search engine case. But that does mean the answer to my fairness concern, triggering back to the Copyright Act, is your client only displays other people's information. Yes, as like Google. So we're at display. And we don't deny that it's display equals causes to be shown. So then we have to go a deeper level into the subterranean world to say, OK. And you agree with him. The key word is transmit. That's what this case holds. Transmit and show, yes.  So how are you not the one transmitting, at least to a driving, moving force extent? Well, I think you have to look at what's transmitted. And what's transmitted has to be a fixed copy. And I think Google's brief addressed this perfectly. It said that it must be a perceptible image. And so when that transfer request goes from web view to Emory's website, that's a request saying, please show me this. Please send me this. It's a request to connect. It's not a public transmit. Is that your theory? Yes, sir. And if you intercepted that in mid-flight, what that would tell you would be, show me this content. Show me this. It's not going to say, if you intercepted it and you translated it, it wouldn't show you an image. And it wouldn't show you content. That content and that image doesn't come until the message is received by Emory. And when Emory gets that receipt, it has a number of things it could do. It could put up a paywall. And there's plenty of it. Well, I asked that. But his response was, nothing in this record indicates that Emory could have done anything to prevent your client's snatch and grab. That is not correct. OK, so what do we know? There's plenty of record evidence. What's the strongest record evidence that Emory can block, paywall, watermark, any of the above? So the strongest evidence is that during his 30B6 deposition, Emory talked about his paywalls. They talked about how it stopped people from coming in and how it worked in the fact that you got a limited amount of information. Or you got one or two or three articles. And then after that, you were shut off. You couldn't get any more information. That's what the Times-Picayune does, right? Yes, sir. You get your two articles per month. And then after that, you have to either get a subscription or you have to find the information somewhere else. And that's an effective way to do it. But there also is evidence in the record and in the amicus briefs that show, to tell us that, as a matter of judicial notice, you can take notice that there's an HTML code. There's code that Wyatt can put, I'm sorry, Wyatt, Emory Newspapers can put into his programs that says, do not embed this. Do not send this information. So statutorily, you are both telling us to really focus on transmit. Your argument is asking for Emory to transmit is not you transmitting publicly. Is that the core argument? Because the copy that comes through the cyberspace. And what other circuit, the First and Seventh, seem to have cited it favorably. But would you say they've adopted identically that? No, I would not go that far. So has any other circuit adopted it identically? What did we do in BWM? BWP or BWP? BWP, you're right. In BWP, they dodged the server test issue, which is fine. But in BWP, they turned to volitional conduct rather than the server test. And the volitional conduct was, and it's not a voluntary act. What it is is, what did you do that approximately caused this item to appear on the web browser or the computer? That's what it is. OK, but isn't he telling us that's what SDNY did in Goldman? It's a volitional test thing. And therefore, tell me, would you fail under that test if that's what we've nudged towards? Goldman and the Southern District of New York. Or under BWP. BWP, Goldman, the Southern District of New York cases, they did not involve search engines and browsers. They did not involve that. This case involves a search engine and a browser. Also, in all those cases, there was pretty much, in every one of those cases, some kind of deception involved. They were trying to pass themselves off as Emmerich's website, their own website. That any content was their own, not Emmerich's. Yeah, that's a little treacherous to get, because the glitch period here, arguably, is exactly that, right, your glitch period? Yeah, except that in our situation, when the glitch period happened, I just want to make sure your honors are clear, that the glitch period did not mean that we weren't pulling that information from Emmerich newspapers, just like we do with the WebView. We didn't have a copy of the entire copy of that. We had to go back to send a message. I think they admit you win under the server test. They're just saying we should adopt a more volitional test, is what I heard. And is it your purpose to deceive people into thinking it's your information, not theirs? So I think that that's what their position is. But we think that position is incorrect. And we think that the server test, your honors should adopt a server test. It's a bright line rule. It's easy to comprehend. The Ninth Circuit has been working under the server test for 20 years. It's rejected in any instances where the courts or parties would try to limit the service. But it's odd no other circuits embraced it. And every single district court in Sussex Circuit, according to them, I don't remember you saying that's wrong, haven't. It's sort of odd that the Second Circuit hasn't resolved that. I think the problem maybe is with the bright line test. I think the courts don't really like bright line tests. That they breed animals like we have the deception. Your 101 focuses more on the verb transmit than it is on fixed? Or do you want to quickly? I've never quite understood the fixed logic. What is it, in short? So fixed means fixed on the server. But it doesn't say that in the statute. No, your honor. But I think you can use, if you read all of them together, all the words together, which we're required to do as lawyers, and the judges are as well. You have to read all of the language together. You have to read transmit, you have to read copy. You've got to read everything together, including otherwise communicate. You have to read it together. And it has to be associated with what the intent of the drafters were. So is the server test specifically delineated in the statute? No, it's not. I don't think that they contemplated the server test. If we erase the server test, why would a client like yours ever have a partnership? Why would you ever have a licensing agreement if you can just grab it anyway? Because when we have a partnership or an agreement, both of us benefit from the arrangement. Oh, this prevents them from blocking you. Yes. That's what the agreement is. So it's, I mean, inflammatory word. So it's the suckers that don't have the ability to block that you're going to grab from, but you're going to cut deals. Or there's some that don't want that process to be a part of their transfer of information over the internet. I mean, there's some entities like that. OK, go ahead. Nonprofits, for example. They don't want to block anybody from doing that kind of thing. But I think that what you have here from a standpoint of the server test is it's a bright line test. And I think that the courts don't necessarily like bright line tests, but in this case, it was neat. It's been the backbone of the internet for 20 years. The free exchange of information from one internet server, one browser to another, one website to another. That's the whole building block of the internet. And what they want to do is to eliminate that building block. And they want you to say, OK, you can do that, but you've got to pay me for it. That's, in essence, what they're saying. You can do it, and you can freely get the information from me. But when you do it, or before you do it, you have to pay me. You have to pay me for that information. I deserve payment for that, but that's not the way. How does your client fare with the ALI and the project that they came up with? They have a whole, they generate a lot of paper, I guess is the way to put it. And they spent a lot of time working on exactly this sort of stuff. Do you have a problem with the end result that they came up with, or what? With the restatement? Yeah. The American Law Institute, I think, hit the nail on the head here. I mean, I think that it's a- In your view, they got it right. I think they did. Well, they adopted Perfect 10. They did, to an extent. But it makes sense to me. It makes common sense to me. Otherwise, if you're a news broadcaster, and you say, if you want more information, go to www.moreinformation.com. Well, under their process, that would be, if you went to that, that would be a violation of the Copyright Act. And the person who told you that, the news announcer, he would be held liable for that. And that's no way that that's what, is the way the internet works, or the way the Copyright Act should work. And another example. If you were a professor, and you're in class, and you say, all right, class, open your laptops up, go to www.NewYorkTimes.com. You go to www.NewYorkTimes.com, the way they want it to be read, the professor that says, sends the students to www.NewYorkTimes.com, is an infringer. I think they disagree. They'd say that the professor's verbal encouragement facilitated it, but the magic work in the statute is transmitting, and your software helps the transmission. So all this, my New Yorker example, or the professor example, no one's transmitting anything there. But here, the defendant actually is transmitting a request, and then displays. Right. But the request that's being transmitted is not the image. It's not the content. It's not a perceptible image. It's not a fixed copy. The fixed copy occurs when it's sent from Emmerich server, which has a fixed copy, to the user server. That's when the fixed copy attaches. We've asked you a lot, but the second issue is also a pretty complex, significant one. You wanna take a dive at that one? Yes, yes, your honor. I think that, I think that, from a standpoint of the CMI, the highlight, the best issues, and the most significant issues are the fact is, what did the judge rule? The judge ruled, in this case, that the facts were, in response to the motion for summary judgment, and through extensive discovery in this case, they did not establish that URLs, the URLs that they used, are CMI. I agree with that, but I thought we were facing a certified question, on interlocutory review, and your brief saying, as a matter of law, a URL can never be CMI. That's a very different thing than these URLs that were deleted are. But they want you to look at what Emmerich did. That's why they're citing titles. Isn't your position that we would find no other URL could ever be, or does that not? I think that you should find that, because a URL is a locator. It's a locator of information on the internet. It's not a locator or direction to find copyright management information. Copyright management information means that Circle C, with a circle around it, that's copyrighted from this, and what follows behind that? The author, the owner, the title? Yeah, but we took a step beyond ISBN Circle C when we said file names, too. Right, and I think that, Your Honor, this panel, in fact, found that CMI should be construed broadly, and I think that. And a file name isn't really a locator. No, it's not. Okay, so. But it is part of the locator. It's in a long list of URLs. The Fifth Circuit uses and reduces URLs down, and that's what they're complaining about, is we reduced it down in our share buttons, where it was a small thing that didn't recognize, was not recognizable to what they were using originally. But, I mean, when y'all cite the cases, or to law review articles. We shortened it. You shortened it. Are y'all infringers? No, I hope not. So I think that what you need to do is you got to look at what a URL is, and a URL is a locator. But once you say it's a locator, how do you not also then fall into, it's a link, the separate subsection violation? How can it be a locator that's not a link? Because it has to be a link to copyright management information, copyrighted information. It's like. But the article is. Yeah, well, I'd like to expand on Mr. Wallace's analysis. Okay. So my analogy is that if you send a letter, snail mail letter, to Chicago, Illinois, and you send it to whatever street you want to pick, but you, and you send it to a person's name, John Smith, and you omit the number, or the P.O. box, well, you've sent a user to a city and a street, but there are a lot of individual addresses on there, and John Smith may live at one address or another, and so you got to go knocking on the doors to find out who John Smith is. And that's what the URL does in this case. So no information's conveyed, in fact, less. I think so, yes, yes, I think it's, you have to have a direction from the URL to the copyright management information. And in this case, the direction in Emirates sent you to a website with a lot of articles that contained copyrighted information, non-copyrighted information. It contained school lunch menus. Those things are not copyright management information. Those things are the number of different houses on the street that you might go knocking on the door to find John Smith. That's not evident here. I don't think that they have directed the users to anything other than a webpage with a lot of different things on it. And all those series of cases that they've cited and we've cited all come down to where do you send the user? Where is the user going to when he hits that URL? Well, he's going to a lot of different places, but he's not going to a Circle C with an author and a title and a name. It may have a title in the URL. And in this case, they made representations that every one of them contained the title. And there is no record evidence that establishes that. Their URLs, at least most of them, did not contain titles. And for them to represent that they did contain titles is just a misunderstanding of the record. Back on the server test quickly, because he stated his favorite rule is articulated in gold. If I remember your brief, you said, oh, we would win under gold anyway. Why? They specifically said that what the defendant in that case was doing was not like what Google does, which is to direct and transmit and send the user to the host server for them to send the information back. They were putting themselves out there as if they were the one that drafted. In that case, I think it was a picture of Tom Brady. They were the ones that took the picture of Tom Brady, and they were the owners of that information. So under Goldman, under the other Southern District of New York cases, under the two district court cases in Texas, it's our position that we win. We win. And that is why you accept copyright liability for the glitch years? We accept copyright liability for the glitch years because it was an error. And we accepted the fact that we made a- And what effectively happened was the Brady picture seemed to be yours. Yes, yes. For a brief period of time, on only one device, it was only the Android device. And it was not an Apple device, it was not your home computer that you clicked on and used the app, only the one device. It was a limited amount of times that it occurred in a limited period. And as soon as we found out about it, we fixed it. But that doesn't mean we shouldn't pay for it. There's a glitch. During the glitch period, help me understand why that violated the Copyright Act under the terms that we've been talking about, transmit, copy, fixed. What were you doing then that fell into the terms of the Copyright Act that you're not doing now? So as far as the transmit of the WebView and the WebView process, it didn't change. It still pulled that information down from Emory. That's not a violation. Even during the glitch period, that's not a violation. Yeah, but how were you violating? You just said you accepted the violation. We treated it and we published it as our own. Just like the ones in Southern District of New York and other cases. We did not have, so let me back up a little bit. Were you not transmitting? You were not transmitting during the glitch period? No, we were receiving the information. So what were you, I guess what I'm doing, what were you doing that violated the Copyright Act? So we were passing it off as our own. Were you showing a copy of it? We were showing a copy of it. Let me back up, let me tell you what the app does real quick. I'm out of time. No, no problem. So what the app does when it's showing a partner's website, so the partner's website is shown within our app. It's showed like it is on Newsbreak. There's no ads as far as Emory, if he was a partner. There wouldn't be any of his ads around. We would share revenue, ad revenue, with that partner that was bringing it down, and that's how the partnership worked. In this case, we took out those things, and that's a violation of the copyright laws. But what we did to get that information was not a violation. So it's not a display transmission violation, it's a reproduction violation? Yes, it would be. That makes sense, okay. Thank you, counsel. Thank you. We'll do our best. We have rebuttal arguments. May it please the court, let me start with another word about transmission. As I understand, Mr. Carmody, his position is that asking Emory's computer to display Emory's article to somebody else is, the asking is not a transmission. Transmit is a broad word including communicate. Communicate means conveying information. What happens here is that particle conveys information to its customer, its customer clicks and says, I'm interested in this information, thereby conveying information to Emory to display the article. I think that whole chain of communication is a device or process which Congress says is so broad, we're gonna do this. It's a three-cushion bank shot, the next case may be a four-cushion bank shot, but they're all trying to get around the problem that the way they wanted to make business, which was to download onto their site and just sell ads directly, is clearly illegal. And they say, well, what's another way we can sell our ads? I know, we'll make Mr. Emory do the transmission. But you like me, because you love appellate work. How appealing, do you know the website? I know it, I don't, I know so little about websites, but I know it exists. No, I go there and then I click to see Bollock Conspiracy. I think he's asking them to show it right there for me. Would he be violent? I don't know enough about it to know, but once again, display is pretty broad, transmit is pretty broad, and fair use is pretty broad. I mean, if all you're doing is communicating ideas and not making money on it, then I'll bet you you're gonna have a pretty good fair use defense, but you don't take care of those people by refusing to apply the full scope of the language Congress shows. So you're saying, yes, Howard Basham's in trouble, it just may be fair use. It just may be fair, again, I don't know how he works, but I don't think you've solved the problem of innocent people getting caught into the copyright by ignoring and distorting the words Congress chose. You give Congress's words, they're full scope, and then you get on to, is there a good reason why we shouldn't do this? They say the good reason is that Mr. Emory could have blocked all of this. His testimony says he can't. His deposition says he tried, he tried to put up the paywall. I thought that he said the deposition, when we look at it, said that he actually does, after a couple times, the paywall chops it. It may be fixed by now. I do know that when Judge Lee looked at it, Judge Lee held that they were not circumventing the paywall because the paywall didn't work. And so what this said, and of course, that issue isn't here yet. Maybe it'll be here, you get to hear this case again. But all of that shows that blocking is not easy. It's particularly not easy for small businessmen like Mr. Emory. It may be easy for Google to block people or other people to block people. He tried and it didn't work. So the fact that they were able to sell ads on his articles and not his fault, he tried to stop it. And with the volitional test, I think they're in trouble. I don't wanna, I wanna say just a word about URLs. I don't understand the problem that if you go to a apartment building in Chicago and you find 100 apartments there, that that takes you outside of the Copyright Act. If you go to a place and there's one thing there, then you have violated the Copyright Act. And the fact that there may be a bunch of other things there, I don't see how that, I don't see how that takes you outside the Copyright Act. The way this worked, they send out a snippet today, you hit the button, you get the article. Most of that is going to happen more or less instantaneously. I'm sure Mr. Emmerich may clean things off his website eventually, but not in this timeframe. Those articles were there, those articles were seen, and those articles ought to require compensation under the Copyright Act. You wanna get to the ultimate limiting principle in this case, if they wanna sell ads using Mr. Emmerich's business, they ought to pay for it. The people big enough to sue them and win can't pay for the use of their articles. We don't, but we're big enough to sue them, and I think we're gonna win. I ask for reversal. Thank you both. The case is submitted, and that concludes the sit-in. We appreciate everyone's.